**UNITED STATES of America, Plaintiff,**

v.

**Nadine Jennifer HANDY, Defendant.**

**No. CR–90–0379.**

United States District Court,
E.D. New York.

Nov. 19, 1990.

George Goltzer, New York City, for plaintiff.

James Orenstein, Asst. U.S. Atty., for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Prior to proceeding with the pronouncement of sentence upon this defendant, the government was advised of the court's intention to depart downwardly from the guidelines and announced its readiness to proceed with sentence.

I began with summarizing the facts upon which my sentence determination will be based.

Ms. Handy pleaded guilty to a single count indictment charging her with conspiring with William Johnson to distribute and possess with intent to distribute cocaine. The events leading up to her arrest describe a *reverse buy*—that is to say—the defendants were not selling cocaine to an undercover officer or to a confidential informant, but were negotiating to *buy* cocaine for a stated price. The money with which to consummate the purchase was in a handbag on the floor near Ms. Handy and totaled $75,000. Also in her handbag were a diluent used to "cut" cocaine and glassine envelopes.

Johnson was, for the preceding five years, Handy's boyfriend. On the day prior to her arrest, he requested her to accompany him to New York City to buy narcotics. She agreed to accompany him and to carry the purchase money. She denied ever having done so before. She admitted to knowing for at least two years of Johnson's involvement in illegal activity based upon the inconsistency between his lifestyle and his earnings as a meat cutter and she suspected that the illegal activity was drug related.

The facts which identify this defendant as Nadine Handy, a *person*, rather than an objective manifestation of discrete criteria to which are assigned numbers which, when added together yield a sentencing result, are as follows:

She was born in Baltimore, Maryland, thirty-six years ago. She was one of ten children whose father died when she was three and whose mother died at the age of forty when the defendant was fifteen years old. She is the mother of three out-of-wedlock children. She gave birth to her first child when she was seventeen and still in high school. He is now nineteen years old and is a strong candidate for a basketball scholarship to college with aspirations of playing professional basketball thereafter.

She gave birth to her second child, a daughter, two years later and left high school. This child is now sixteen, is enrolled in the "gifted and talented" class in her local high school and is the likely recipient of a $1,000 annual college scholarship.

She gave birth to her second daughter who is now eight years old and in the third grade. All the children live with her. She has no prior criminal record.

Ms. Handy has been gainfully employed for the past thirteen years. For the past eight years she has been employed by the same firm, Farm Fresh Food, Inc. in Baltimore to which she returned to resume her work when released on bail. She has borne the sole responsibility for rearing her three children and supporting them without public assistance. She also undertook to care for the two children of her boyfriend, Johnson, when they came to Baltimore from California. Letters written on behalf of Ms. Handy describe her selflessness in that regard and the positive influence she has had on their lives.

The picture of Ms. Handy portrayed by the salient facts I summarized and by the many letters on her behalf, is of a young woman born into and reared in poverty in an urban environment which is a socio-economic minefield through which she threaded her way and emerged unscathed, relatively speaking. That is to say, she abjured the suffocating effects of the world of welfare for the independence and dignity-reinforcing world of work and has been steadily and gainfully employed for thirteen years. She has single-handedly and successfully guided three children through the socio-economic minefield of a not atypically treacherous urban environment. Letters addressed to the court attest to the high regard in which she is held at work and in her community. What then brings her before the court? The explanation which is all but inescapable is that this single parent fell in love with the co-defendant, William Johnson and despite her many other strengths did not have the strength to say "no" to him. The story is as old as the story of civilization—he offered her an apple and she did eat. That the government did not view her as a sophisticated, knowledgeable drug dealer is indicated by its stipulation at the time of her plea not to oppose a four point guideline reduction for her minimal role in the offense. There is no indication that the defendant was drawn to trafficking in drugs by the lure of the huge sums of money incident to such traffic. Were that the case it would be reasonable to assume that she would not persist in working as a meat wrapper at an average salary of approximately $250 per week.

Is a downward modification appropriate and justified by the statutes and the guidelines promulgated pursuant thereto? I believe it is. I believe that the conclusion I reach is one a sentencing judge is permitted to reach within the framework of the guidelines. I do not depart as an expression of general dissatisfaction with the guidelines. It is rather late in the day for that and would be tilting at windmills. In addition such dissatisfaction has been expressed quite eloquently by others. *See, e.g.,* dissenting opinion by Chief Judge Merritt in *United States v. Brewer,* 899 F.2d 503, 512 (6th Cir.1990) ("In devising a fair sentencing system, there is something worse than small disparities in sentencing—mechanistic rules that impose unjust or arbitrary punishment because they preclude the sentencing judge from considering all relevant factors and nuances in the case.").

What is the framework of the statutes and guidelines within which I depart?

I begin with Policy Statement 4(b) of the U.S.S.G. at pp. 1.5, 1.6 (Nov. 1, 1990), which, in relevant parts read:

> The sentencing statute permits a court to depart from a guideline-specified sentence only when it finds an "aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes.... the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could

constitute grounds for departure in an unusual case.

\*     \*     \*     \*     \*     \*

The Commission has adopted this departure policy for two reasons. First, it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision....

\*     \*     \*     \*     \*     \*

A second type of departure will remain unguided. It may rest upon grounds referred to in Chapter Five, Part K (Departures) or on grounds not mentioned in the guidelines. While Chapter Five, Part K lists factors that the Commission believes may constitute grounds for departure, the list is not exhaustive. The Commission recognizes that there may be other grounds for departure that are not mentioned; it also believes there may be cases in which a departure outside suggested levels is warranted. In its view, however, such cases will be highly infrequent.

The crux of the matter lies in construing the language of 18 U.S.C. § 3553(b), and § 5H1.5 and § 5h1.6 of the Guidelines. Section 3553(b) has been alluded to above. Section 5H1.5 provides:

> Employment record is not *ordinarily* relevant in determining whether a sentence should be outside the guidelines or where within the guidelines a sentence should fall. (Emphasis added).

Section 5H1.6 provides:

> Family ties and responsibilities and community ties are not *ordinarily* relevant in determining whether a sentence should be outside the guidelines. (Emphasis added).

A reading of the statute and the guidelines immediately raises two questions. (1) How does the court find whether a given circumstance (aggravating or mitigating) was or was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines? (2) What standard is the court to apply in determining what is or is not "ordinary" or within or without the "heartland" carved out by the

guidelines? Unfortunately, interpretation cannot begin with the plain meaning of the words of the statute and the guidelines because the meaning of "adequately considered" and "ordinarily" is not plain. In this regard Judge Posner made insightful observations on statutory interpretation in *Friedrich v. City of Chicago*, 888 F.2d 511 (7th Cir.1989). He wrote, at 514:

> ... interpretation must begin with the linguistic and cultural competence presupposed by the author of the statute. "Language is a process of communication that works only when authors and readers share a set of rules and meanings...." judges realize in their heart of hearts that the superficial clarity to which they are referring when they call the meaning of a statute "plain" is treacherous footing for interpretation. They know that statutes are purposive utterances and that language is a slippery medium in which to encode a purpose. They know that legislatures, including the Congress of the United States, often legislate in haste, without considering fully the potential applications of their words to novel settings....
>
> When a court can figure out what Congress probably was driving at and how its goal can be achieved, it is not usurpation—it is interpretation in a sense that has been orthodox since Aristotle—for the court to complete (not enlarge) the statute by reading it to bring about the end that the legislators would have specified had they thought about it more clearly....

Although the "plain meaning" of the word "ordinarily" may not be shared by the authors and readers of §§ 5H1.5 and 5H1.6, the presence of the word in those guidelines is significant. In *United States v. Sharpsteen*, 913 F.2d 59 (2d Cir.1990), the court considered whether the district court erred as a matter of law in believing it lacked authority under the Guidelines to make a downward departure based upon § 5H1.6 factors. In concluding that he did the court wrote:

> Section 5H1.6 specifies that these considerations "are not *ordinarily* relevant in

determining whether a sentence should be outside the guidelines." (emphasis supplied) This contrasts with section 5H1.10 which deals with race, sex, national origin, creed, religion and socio-economic status. Instead of specifying that certain factors are not "ordinarily relevant," section 5H1.10 excludes without qualification the aforementioned characteristics as relevant to a determination of a sentence. The clear implication of section 5H1.6 is that if the court finds that the circumstances related to family ties and relationships are extraordinary, it is not precluded as a matter of law from taking them into account in making a downward departure.

*Id.* at 63.

I find the circumstances related to family ties and relationships and to previous and current employment record to be sufficiently extraordinary to warrant a downward departure for the following reasons. Although *ordinarily* an employment record is not relevant in determining whether a sentence should be outside the guidelines U.S.S.G. § 5H1.5, the continuous employment for thirteen years of this single parent of three teenage children is extraordinary. That factor, coupled with the fact that an exceptionally promising future of the older two children would be threatened by the prolonged incarceration of this mother drives the court to conclude that a downward departure is warranted. *See United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir.1990); *United States v. Big Crow*, 898 F.2d 1326 (8th Cir.1990); *United States v. Mills*, 1990 WL 8081, 1990 U.S. Dist. Lexis 400 (S.D.N.Y.1990).

Lest the decision in this case is sought to be regarded as authority for a downward departure in every case of a single parent, or in every case in which a defendant has been gainfully employed, I emphasize that it is not so intended. The decision in this case is intensely fact specific. I also wish to emphasize that although passing references have been made in the course of this opinion to the socio-economic background of the defendant and to the fact that she is a first offender, those factors were *not* regarded as factors warranting a down-ward departure. The court is mindful of U.S.S.G. § 5H1.10 and of the teaching of *Jagmohan* that it is erroneous to depart based upon the lack of a criminal record.

The Policy Statement cited above as well as the Policy Statement to be found at U.S.S.G. § 5K2.0 support the court's view in *United States v. Lara*, 905 F.2d 599, 604 (2d Cir.1990) "that it was not Congress' aim to straitjacket a sentencing court, compelling it to impose sentences like a robot inside a Guidelines' glass bubble, and preventing it from exercising discretion, flexibility and independent judgment."

Having decided that a downward departure is consistent with the spirit and the letter of the guidelines, after considering the guidelines, policy statements and commentaries of the Sentencing Commission, 18 U.S.C. § 3553(b) directs that the sentence to be imposed shall be one having due regard for the purposes set forth in 18 U.S.C. § 3553(a)(2) which provides that the court shall consider:

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Having given due consideration to all those purposes, the defendant is committed to the custody of the Attorney General for a period of six months, to be followed by a five year period of supervised release. A special assessment of $50 is also imposed.

The government does not oppose the defendant's application to be permitted to surrender voluntarily to the institution to which she is designated, and it is

SO ORDERED.