### UNITED STATES of America

### v.

### Derrick INGRAM, Defendant.

### Crim. No. 91–0203–02–LFO.

United States District Court, District of Columbia.

March 24, 1993.

Maurice Ross, Ann Rosenfield, Abby Stav-itsky, Asst. U.S. Attys., Washington, DC, for U.S.

G. Allen Dale, Washington, DC, for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Defendant Derrick Ingram was before me on February 4, 1993, after he pled guilty to maintaining a crack house in violation of 21 U.S.C. § 856(a)(2). For reasons stated from the bench and in a memorandum to be filed, Ingram was sentenced to the four and one-half months he had served between a first and second trial on a related indictment, since dismissed. This is the memorandum anticipated at sentencing.

### I.

On March 18, 1991, Metropolitan Police Department officers executing a search warrant at premises leased to one Vernon Harrison, found Ingram and Maurice Copeland and arrested them. On April 16, 1991, the prosecution filed a one count indictment charging Ingram and Copeland with possession with intent to distribute 5 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii). After pleading not guilty, they were released pending trial.

On November 18, 1991, after delay occasioned by the medical condition of Ingram's appointed counsel, Abbe Jolles, the trial commenced, only to be interrupted by Jolles' physical inability to continue. She was reinforced by Alan Dale, who later accepted appointment and took over the case Jolles had

prepared. The trial resumed on November 21, 1991, and ended with the jury voting to convict Ingram but unable to agree on the guilt or innocence of Copeland. When the prosecution requested a new trial for Copeland, I granted Ingram's motion for a new trial as well, primarily due to concern about the adequacy of Jolles' preparation and representation, particularly in light of her medical problems, and because of doubts about the credibility of some of the prosecution's evidence, both physical and testimonial. Since Ingram had been convicted, however, I granted the prosecution's request that he be detained pending the second trial.

For the second trial, Ingram's new counsel, Dale, traveled to South Carolina and located and subpoenaed Harrison. With Harrison as a witness,[1] Ingram put on a strong affirmative defense to the p.w.i.d. indictment. The second jury was unable to reach a verdict with respect to either Copeland or Ingram.

Shortly thereafter the prosecution requested, and I scheduled, a *third* trial of the two defendants. Additional doubts about the credibility of the prosecution's evidence and the relative roles of Ingram and Copeland, however, and the fact that Copeland was not detained and Harrison was not charged, persuaded me to release Ingram pending the third trial.

Before the third trial, the parties negotiated an agreement in which the prosecution dismissed the charges against Copeland and Ingram agreed to plead guilty to the new and lesser charge of maintaining a crack house. Ingram entered this agreement in reliance on the prosecution's commitments that it would dismiss its original p.w.i.d. indictment altogether and that the sentencing decision on the new charge could include any enhancement or adjustment mandated by the Guidelines (some of which were listed in the plea agreement). In particular, the agreement committed the prosecution not to "oppose a two-level reduction in the base offense level for acceptance of responsibility." Plea Agreement Filed September 10, 1992 ¶ 2.

Dale subsequently filed an extensive presentence memorandum, supported by exhibits, which recommended that the base offense level be adjusted for Ingram's acceptance of responsibility through drug rehabilitation, his role in the offense, extraordinary family circumstances, and the prosecution's withholding of *Brady* information. The prosecution challenged Ingram's request for any downward adjustment (including any adjustment for acceptance of responsibility) in violation of its plea agreement. Indeed, the prosecution recommended enhancement of the base offense level on the theory that Ingram played a key role in the offense.

The Probation Officer originally recommended a two-level downward adjustment to the base offense level for Ingram's acceptance of responsibility in entering the plea, as provided by the plea agreement. This would have resulted in an offense level of 14 and a sentencing range of 15 to 21 months. In conference with me before the sentencing hearing on February 4, 1993, however, the Probation Officer determined, on reflection, that Ingram was entitled to a three-level reduction for acceptance of responsibility under the new amendment to U.S.S.G. § 3E1.1, effective November 1, 1992, as well as a two-level reduction for Ingram's minor role in the offense. U.S.S.G. § 3B1.2(b). The Probation Officer therefore determined that Ingram's offense level should be reduced to a level 11, resulting in a minimum Guidelines sentence of eight months. Because Ingram already had served four and one half months between his first and second trials, an additional four months of home detention satisfied the Guidelines' eight-month sentencing requirement.

At sentencing, I approved downward adjustments of three levels for acceptance of responsibility and two levels each for Ingram's minor role in the offense and extraordinary family need. The adjustments yielded an offense level of nine and a Guideline minimum of four months—an appropriate minimum in light of the unusual trial developments and the presentence information outlined below. Ingram accordingly was

---

1. Harrison gave a documented account (exculpatory of Ingram) of the money the officers testified

was scattered about the room in which they tackled and arrested Ingram.

sentenced to time served, with three years of stringent supervised release.[2]

## II. FACTS

### A.

The preponderance of the evidence presented at both trials and in presentence proceedings establishes the following for the purposes of sentencing: Between March 9 and March 12, 1991, a confidential police informant purchased drugs at Harrison's apartment at 505 Florida Avenue, N.W. *See* Affidavit in Support of an Application for Search Warrant dated March 12, 1991. A warrant to search the premises was issued and was executed on the night of March 18, 1991. Evidence developed in the course of presentence proceedings (but not available at either trial) established that a second drug purchase was made at the apartment an hour before the police search.[3] At that purchase, the confidential informant exchanged a marked $20 bill with Copeland. The bill was recovered in the police search an hour later.

At trial, officers of the Metropolitan Police testified that as they approached the apartment that night, Copeland was visible through a window in the doorway. Copeland dashed into the apartment interior when the officers knocked and announced their presence. When they entered the apartment, Copeland had returned and threatened the police, wielding a large wooden table leg like a baseball bat. The leg had been whittled into a handle at one end for use as a weapon.

After subduing Copeland, the officers entered the dimly lit living room where Ingram was standing. The floor was strewn with U.S. currency totaling over $1,000 in small bills. A search of Ingram's person produced three rental receipts for the apartment signed by Ingram on behalf of Vernon Harrison, the lessee. In the living room, the officers recovered two bags of ziplocks containing approximately 25 grams of crack cocaine. From a cot in the apartment, the officers also recovered a duffel bag containing drug paraphernalia and a police radio scanner. Identification found on Ingram indicated that he lived at another address. None of Ingram's possessions were found in the apartment, and his fingerprints were not found on any of the objects recovered. No drugs were found on his person.

The first trial was marred by contradictory testimony by the arresting officers as well as errors by defense counsel. At both the first and second trials, testimony by the prosecution's witnesses produced a disturbing conflict regarding whether or not Ingram was holding money in his hand when the police entered, the amount of that money, if any, and whether or not any money was recovered from Ingram's person. The conflict left doubts as to how the bills came to be strewn on the floor and to whom they belonged.

At the first trial, Officer Todd Williams testified that he was the first officer to enter the premises on March 18, 1991, together with Officer Jeffery Tolliver. Williams testified that when he first saw Ingram, Ingram was standing in the living room and that Ingram had nothing in his hands, either then or thereafter. Tr. 11–19–91 at 26. Sergeant John Hickey and Tolliver testified that Ingram was holding an unknown amount of money when they first saw him, Tr. 11–19–91 at 59, 174, and Sergeant Hickey testified that when Ingram was placed under arrest, he was told to drop the unknown sum of money to the floor. Tr. 11–19–91 at 174. Tolliver testified that the unknown sum was seized by someone from Ingram, but he did not know who seized it, Tr. 11–19–91 at 63. Tolliver and Sergeant Hickey testified that all the money recovered from Ingram was recovered by Officer Richard Anastasi, Tr. at 177, and Williams confirmed that he thought Anastasi

---

2. The terms of Ingram's supervised release require that he submit to urinalysis and any drug rehabilitation as directed by the Probation Office, maintain employment and cooperate with the Probation Office should he become unemployed. Ingram is required to live with his mother and maintain a home for his children. He is prohibited from violating any federal, state, or local law, from possessing a firearm or other dangerous weapon without a license, and from using or possessing any illegal drugs or associating with any drug dealers. *See* Transcript of Presentence Hearing, February 4, 1993, at 28–29.

3. *See* discussion of Ingram's frustrated *Brady* request, *infra* at 30–31.

had searched Ingram. Tr. 11–18–91 at 19. Anastasi, however, testified that he did not search Ingram, but spent most of his time with Copeland. He stated, in the face of repeated questioning, that he did not remove any money from Ingram but took the money off of Copeland. Tr. 11–19–91 at 70–72, 75–78.

At the second trial, Tolliver testified that he believed Ingram was holding money in one hand which fluttered to the floor, but could not identify the amount. Tr. 2–7–92 at 82, 83, 90. Sergeant Hickey, the only officer who testified that he observed Ingram holding money and who could quantify the amount, testified that Ingram was holding only a couple of dollars. Tr. 4–8–92 at 12. Anastasi reversed his testimony, stating that he had searched Ingram, found $77 in Ingram's hand and $540 in Ingram's pocket, and that no money was found on Copeland. Tr. 4–7–92 at 107.

Despite the conflicting testimony about the quantity of money, if any, that the evidence tied to Ingram, all the money recovered from the floor of the apartment (which totaled over $1,000) was placed into envelopes by the police and marked with the name "Derrick Ingram." Thus marked, the envelopes were received in evidence at the first trial. Sergeant Hickey gave unchallenged testimony at the first trial that the government's exhibit envelopes containing the money and the drugs, government exhibits 38, 39, and 40, were marked with a description of their contents, "and then *the name of the defendant whom it was taken from* [was] on the envelope." Tr. 11–19–91 at 143 (emphasis added).

At the first trial, the prosecution introduced a marked $20 bill that allegedly had been recovered during the execution of the search warrant. Tr. 11–19–91 at 145. The bill was marked with the date "3/18/91" and was identified as having been used by the police informant to purchase drugs at the address. Despite the fact that Ingram's counsel had made a *Brady* demand for all exculpatory evidence, however, the prosecution had not produced the bill to Ingram's counsel and she was not aware of the bill's existence until it was introduced during Sergeant Hickey's testimony at trial.[4] Defense counsel did not cross-examine Sergeant Hickey regarding the bill. The prosecution did not introduce the $20 bill into evidence at the second trial, representing that the "backup" information about the $20 bill had been lost. Tr. 4–6–92 at 16–17.

The prosecution previously had represented to Ingram that the only drug purchase by the confidential informant had been made six days before the March 18 search. At the presentence hearing and in his presentence pleadings, however, Ingram proffered, without contradiction,[5] that the $20 bill in fact was used to purchase drugs in a second, "backup" buy from the apartment by the confidential informant on March 18, 1991, an hour before the search. Defendant's Memorandum in Aid of Sentencing at 17 and n. 10. Ingram proffered that the police informant described the individual who sold the drugs on both occasions as a man with dredlocks. This description fits that of Copeland, who wore dredlocks at the time of his arrest.

The prosecution has presented no evidence that Ingram was present at the time of either drug purchase.[6] The evidence so proffered, and the inferences that reasonably may be

---

4. Prior to the first trial, Ingram's counsel filed a demand for disclosure of all exculpatory *Brady* material. She also moved for disclosure of the identity of the confidential police informant who made the drug purchase relied upon by the magistrate in issuing the search warrant. The government opposed the motion for disclosure, responding that the informant had purchased the drugs at least six days prior to the execution of the warrant, and that the special informant therefore would not be able to provide evidence regarding who had sold drugs from the apartment on the day of the search. Government's Opposition to Defendant's Motion to Disclose the Name of the Informant at 4.

5. In the Government's Response to Defendant's Memorandum in Aid of Sentencing, the prosecution did not refute these allegations. Instead, the prosecution urged that the evidence was not exculpatory and that Ingram, in entering his plea, had waived any right to raise this claim. Gov't. Response at 15–17.

6. Def.Mem. at 15 and Ex. 3 (Memorandum of Points and Authorities in support of Defendant's Motion to Dismiss Indictment or, in the Alternative, to Disclose Name of Informant) at 3–4 (filed as an exhibit).

drawn therefrom, thus establish that it is more likely than not that the $20 bill was exchanged an hour before the search in a drug sale with Copeland and that Ingram was not present. The bill thus plainly was exculpatory evidence for Ingram and should have been provided for the development of Ingram's case. Indeed, the prosecution's introduction of the bill at the first trial without first producing it to Ingram's counsel very well may have been reversible error, warranting striking of the indictment or the granting of a mistrial. Because the prosecution failed to offer the bill into evidence at the second trial, no jury ever has had the opportunity to consider the probative weight of the $20 bill for Ingram's case after adequate and informed cross-examination.

Also at the first trial, the prosecution introduced a number of photographs taken by Sergeant Hickey, whose testimony regarding the pictures was not subject to careful cross-examination. Several of the photographs depicted the same objects in different positions, indicating that the evidence had been moved between photographs. This fact, and the fact that Sergeant Hickey had not been adequately cross-examined, prompted me to comment upon Sergeant Hickey's testimony outside the presence of the jury for the benefit of Ingram's new defense counsel (who was appointed in the midst of the first trial):

> THE COURT: I am in a difficult situation here from the point of view of trying to be fair to both parties. I say this because Mr. Dale may not know about this, and I want to make sure that the defendant has thoroughly effective assistance, in considering Miss Jolles' physical condition the other day.
>
> I was very struck by the testimony of Sergeant Hickey about his management of the crime scene in the foyer. The sequence of pictures, as related by him in the suppression hearing, reveal that he had taken a picture—and it is apparent from the pictures—with the stick on the floor and one with the stick on the chair; one with the knife in one place, and one with the knife somewhere else; one with the trash in the trash can, and another with the trash in the middle of the floor. And

there was his admission that he put the trash in the middle of the floor.

> It has been a mystery to me how that money got strewn all over that room, and you are the fellow [referring to the prosecutor] that suggested that the jury can draw inferences.
>
> I just recite that for the benefit of counsel. The record is open tomorrow morning for anything you want to present in the way of testimony. You have to make your own decision.

Tr. 11–21–91 at 124. Sergeant Hickey conceded at the second trial that items had been moved in between photographs under cross examination by Ingram's defense counsel. Tr. 4–8–92 at 25–37.

On January 8, 1992, Ingram moved for acquittal or a new trial on the grounds that the police officers' testimony "was so contradictory that no rational trier of fact could find beyond a reasonable doubt that Ingram was guilty of the crime charged," Defendant's Renewed Motion for Acquittal or in the Alternative for a New Trial, at 3–4. Ingram also moved for a new trial on the basis of ineffective assistance of counsel, since Ingram's previous counsel had been ill for much of the pretrial and almost the entire trial phase. Defendant's Motion for a New Trial filed January 8, 1992 and Ex. 3, Letter from Derrick Ingram to Judge Louis F. Oberdorfer, dated December 27, 1991. As stated above, while scheduling a second trial for Copeland, I granted Ingram's motion for a new trial, but ordered him detained pending trail.

Ingram's original counsel had failed to call Harrison, the lessee of the apartment, as a witness. With great effort, her replacement, Dale, located Harrison in South Carolina, traveled there to interview him, subpoenaed him, and produced him as a crucial defense witness at the second trial. Harrison testified that he knew Ingram from various construction jobs, but that Ingram never had lived in the Florida Avenue apartment, nor had he spent the night there or left his clothes there in the three months prior to the search. Harrison testified that in January 1991 he had been more than $500 behind in his rent and had asked Ingram to make the

rent payments for him. Harrison promised to reimburse Ingram for the loan with the anticipated proceeds from an insurance claim. Tr. 4–8–92 at 138–139. Ingram agreed and made the payments in three installments on Harrison's behalf. At trial, Harrison identified the receipts found on Ingram during the search as the receipts for these rent payments. Tr. 4–8–92 at 163, 173–174.

Ingram's defense then proved by uncontradicted testimony, corroborated by documentary evidence, that on March 15, 1991, Harrison had received a settlement from the insurance company totalling $8,000. Harrison gave $900 in cash to Ingram as reimbursement for the rent payments. Harrison and his wife then immediately left the District the night of March 15 and moved to South Carolina. Tr. 4–8–92 at 142–143. The search warrant was executed on March 18, 1991. To my knowledge, Harrison never has been charged in relation to these events, nor has the coincidence between Harrison's reimbursement of Ingram, Harrison's sudden departure to South Carolina, and the March 18, 1991 raid been explored in any court proceedings.

After entering his plea, Ingram corroborated Harrison's testimony, representing to the Probation Office that Harrison had offered Ingram the opportunity to make some money by coming to Harrison's apartment when Harrison was not there and admitting others to sell drugs. Because Harrison was behind in his rent payments, Ingram also agreed to advance funds to pay Harrison's rent obligation on the soon-to-be raided apartment. Harrison promised to reimburse Ingram for twice the amount of the loan when he received his insurance claim. Gov't. Response at 14. The testimony of Harrison and representations of Ingram, together with the evidence at sentencing regarding Ingram's drug abuse and expensive drug dependence, support an ultimate finding for sentencing purposes that Ingram was a relative pawn in the drug distribution activity of either Harrison, Copeland, or both.

After plea negotiations and prior to the scheduled third trial, on September 8, 1992, Ingram entered a plea of guilty to a one count information for maintaining a crack house. The prosecution simultaneously dropped the charges against Copeland.

**B.**

Presentence filings establish that Ingram is 35 years old and a life-long resident of the District of Columbia. He holds a General Equivalency Degree, which he received in 1980, and has one year of college education. He is skilled in construction and renovation and has been employed in this trade throughout his adult life. Ingram's prior criminal record consists of a single conviction for possession of a pistol when he was 22 years old. He was placed on probation, which he successfully completed.

Prior to his 1991 arrest, Ingram had an extended history of drug abuse. He began smoking marijuana in 1979 and began abusing crack cocaine in 1989. For the two years between 1989 and his arrest in 1991, he consumed approximately $200 worth of crack cocaine per week. Although Ingram sought out and participated in inpatient drug rehabilitation in 1987, he ultimately failed in that effort.

Immediately after Ingram's arrest in March 1991, however, he voluntarily sought drug rehabilitation treatment at the Upper Cardoza Abstinence Program. He successfully completed the program in September 1991. Ingram also began weekly urinalysis following his arrest in March 1991 until his incarceration in November 1991. All of these tests were negative. Indeed, all of his tests from the day of his arrest until his most recent test in September 1992 have returned negative. At sentencing, Ingram represented that he regularly has attended Narcotics Anonymous meetings since his release in April 1992. Transcript of Presentence Hearing, February 4, 1993, at 26.

Ingram lives with his elderly mother, Gloria Ingram and his two young boys, aged six and thirteen. The older child, Derrick Jr., has lived with his father since he was six months old. The younger child, Dexter, came to live with his father and grandmother in 1991.

At the presentence hearing on February 8, 1993, Ms. Ingram, Sr. testified, without contradiction, that she is neither financially nor physically capable of raising the children herself. Ms. Ingram is a retired public school administrator who is dependent upon a modest pension. Although she tries to help Ingram purchase food and clothing for the children when she is able, ultimately she is financially dependent upon Ingram, and Ingram bears primary responsibility for raising the children. He buys the children's clothes, feeds and dresses them before school, and takes them back and forth to school each day. He is the only effective disciplinarian in the household.

Ms. Ingram's physical limitations make it impossible for her adequately to care for two young boys. She is a diabetic, suffers from severe arthritis and thyroid complications, twice has had back surgery, and suffered a heart attack in February 1991. She presently is on medication for each of these medical problems.

Neither boy ever has had any difficulty at school or with the law when Ingram was home to care for them, either before Ingram's arrest or since. During the brief four month period that Ingram was incarcerated, however, Derrick Jr. twice was found by the police in stolen cars. After the second arrest Derrick Jr. entered a plea, and he presently is serving one year probation. Ms. Ingram testified that, by herself, she was unable adequately to care for the boy and to keep him out of trouble with the police. That was true even though at that time she was responsible only for Derrick Jr. and only for a few months. With two boys in the house and one of them a teenager, she stated repeatedly: "I cannot do it." Tr. 2-4-93 at 17, 16. Ingram represents that he now provides guidance for Derrick Jr. and takes him to group counseling sessions for troubled children. Defendant's Reply to Government's Response to Defendant's Memorandum in Aid of Sentencing at 6. Derrick Jr. has not gotten into any further trouble.

No other appropriate caretaker is available for the children. Uncontroverted testimony at the presentence hearing established that Ingram's estranged wife, Kathleen Ingram, from whom he has been separated since 1988, is often violent and has beaten her children publicly on more than one occasion. As recently as December 1992, a neighbor of Ingram reported that Kathleen Ingram beat Derrick Jr. outside the house with her coat and repeatedly threatened to kill him. Tr. 2-4-93 at 7-8; Def. Ex. 1, Letter of Louis T. Colbert.[7] Prior to April 1992, the younger child, Dexter, resided with his mother. During that period, he was observed at school on at least one occasion attempting to reenact a sexual act with a female student. The incident aroused the serious concern of the principal, teacher, and parents. When questioned why he had behaved in such a manner, Dexter responded that he had learned the behavior at home, from observing his mother and her boyfriend. Following this incident, Dexter was brought to live with Ingram and his mother.

## II.

### A. Acceptance of Responsibility

█ In its plea agreement, the prosecution committed itself not to "oppose a two-level reduction in the base offense level for acceptance of responsibility" as authorized by § 3E1.1(a). Plea Agreement at 2. Nevertheless, a prosecution presentence pleading argued that § 3E1.1 "does not automatically guarantee a defendant a two-level reduction when he pleads guilty." Gov't. Response at 8. Noting that "[t]imeliness is an important factor," it even urged that because Ingram failed to enter a plea earlier, he should not be entitled to the two level reduction that formed part of the plea agreement. Id. The prosecution's opposition to an acceptance of responsibility departure is based on Ingram's delay in pleading guilty to the original p.w.i.d. indictment (since dismissed). In fact, Ingram never plead guilty to that indictment, and the charge to which he pled was not originally filed. Until the second trial and preparation for the third apparently exposed the weaknesses in the prosecution's case and

---

7. This unsponsored, but uncontradicted, document may be treated for sentencing purposes as evidence under both the guidelines and pre-guidelines sentencing practice.

the consequence of the defense errors in the first trial, however, the prosecution never offered to dismiss the p.w.i.d. indictment. Ingram timely entered his plea to the crack house maintenance charge when the prosecution finally offered to abandon the p.w.i.d. charge for which Ingram had developed strong and obvious defenses. His plea, therefore, was timely for the purposes of § 3E1.1.[8]

It is well established that "a defendant who materially breaches a plea agreement may not claim its benefits." *United States v. Merritt*, 988 F.2d 1298, 1313 (2d Cir.1993); *see also United States v. Nathan*, 476 F.2d 456, 459 (2d Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (1973). Nor may the government. The prosecution's about-face on the two-level reduction for acceptance of responsibility violates a solemn commitment of the United States. Ingram is entitled to a two level reduction as a result of entering the plea agreement, and the prosecution's attempt to violate its commitment about acceptance of responsibility simply strengthens his case for that adjustment.

■ Furthermore, Ingram's significant drug rehabilitation efforts entitle him to an additional one-level reduction for acceptance of responsibility. The Sentencing Commission now has acknowledged that post-offense drug rehabilitation efforts are grounds for such a reduction. *See* U.S.S.G. § 3E1.1(a), Commentary (n. 1) (g). This Circuit has stated that drug rehabilitation efforts may even entitle a defendant to a further departure from the Guidelines, "if the rehabilitation is so extraordinary as to suggest its presence to a degree not adequately taken into consideration by the [Guidelines]."

*United States v. Harrington*, 947 F.2d 956, 962 (D.C.Cir.1991); *see also United States v. Maier*, 975 F.2d 944, 946–47 (2d Cir.1992); *United States v. Sklar*, 920 F.2d 107, 116 (1st Cir.1990); *United States v. Williams*, 948 F.2d 706 (11th Cir.1991).

Ingram's post-offense rehabilitation history may not constitute the extreme and rare case described in *Harrington* as justifying full departure. However, his efforts have been substantial and reflect an impressive acceptance of responsibility for the circumstances surrounding his crime. Despite a longstanding drug habit which he unsuccessfully attempted to overcome in 1987,[9] Ingram voluntarily sought out rehabilitation and successfully completed it following his indictment. Every drug test of Ingram taken since his arrest has returned negative, and he regularly has attended Narcotics Anonymous meetings since his release. The uncontroverted evidence establishes that from the time of his arrest to the date of sentencing nearly two years later, Ingram has been entirely drug free. His drug rehabilitation efforts reflect an acceptance of responsibility justifying a one-level departure pursuant to § 3E1.1(a).

## B. *Minor Role in the Offense*

■ The shifting nature of the prosecution's evidence creates serious doubt whether Ingram, or anyone else, could have been proven guilty beyond a reasonable doubt under the original indictment in a fair trial before an impartial jury, where both sides were adequately represented by counsel. To the extent that such a judgment may be made, however, a comparison of Ingram's role with the apparent roles of the other participants establishes that his role was minor, and he therefore is entitled to a two-level downward departure pursuant to

---

8. In light of these considerations, Ingram's entry into the plea agreement on the new crack house charge and dismissal of the p.w.i.d. charge probably would entitle him to an additional one-level reduction for acceptance of responsibility under 3E1.1(b)(2), since he "timely notif[ied] authorities of his intention to enter a plea of guilty" shortly after the government offered to charge him with an offense the evidence likely would support. The Probation Officer agreed Ingram was entitled to this reduction. The parties, however, have not pressed that issue here.

9. Rather than negatively reflecting on defendant's rehabilitation efforts, as the government suggests, defendant's previous failure at rehabilitation is a "not surprising result" for an individual suffering from a nearly ten year drug addiction. *United States v. Maier*, 975 F.2d at 945. Ingram's long struggle with his drug addiction instead reflects the severity of the obstacles he has overcome. *See also United States v. Harrington*, 808 F.Supp. 883, 887 n. 8 (D.D.C.1992).

U.S.S.G. § 3B1.2(b) for this mitigating consideration.

Although Ingram initially was indicted together with Copeland for possession with intent to distribute crack cocaine, the weight of the evidence establishes it is more likely than not that Ingram was a minor facilitator in the operation. Ingram was not the owner or lessee of the apartment, nor was he primarily responsible for maintaining it. None of Ingram's possessions were found in the apartment, and his fingerprints were not identified on any of the paraphernalia recovered. The evidence about the money allegedly found on Ingram and strewn on the floor conclusively establishes nothing. Nor, apparently, was Ingram present at either of the two drug purchases by the confidential informant that proceeded the raid. Other than Ingram's presence in the apartment and the three rent receipts signed on Harrison's behalf, the prosecution has presented no evidence that Ingram exercised "dominion and control" over the drugs, *United States v. Durant*, 648 F.2d 747, 751 (D.C.Cir.1981), or otherwise was responsible for selling them.

■ The weight of the evidence thus suggests that Ingram's role in the operation was limited to allowing Copeland and other people to enter the house when Harrison was not present. Yet, after Ingram entered a plea to the only charge the evidence against him arguably supported, the prosecution dropped all charges against Copeland. Harrison also left town around the time of the raid and apparently never was charged with any offense. The fact that that neither Copeland or Harrison were convicted does not preclude consideration of their very related conduct as part of the total context in which Ingram's relative role in the offense must be determined.[10]

Guideline § 3B1.2(b) provides a two- to four-level reduction for defendants who played a "minor" or "minimal" role in the offense. The Commentary states that a four

level reduction for a "minimal" role applies only rarely to someone who, for example, played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs. U.S.S.G. § 3B1.2 Commentary (n. 2). A "minor" participant, by contrast, is "any participant who is less culpable than most other participants, but whose role could not be described as minimal." § 3B1.2 Commentary (n. 3).

■ The prosecution urges that Ingram's role in the offense must be determined solely in light of the charge for which he is being sentenced. *See United States v. Daughtrey*, 874 F.2d 213, 216 (4th Cir.1989). The prosecution, in fact, seeks a two level *upward* departure for what it considers Ingram's "key role" in that offense. Gov't. Response at 15. The Guidelines, however, do not require such a narrow interpretation. The Commentary to § 3B1.2 states that the adjustment for a minor role is appropriate for "any participant who is less culpable than *most other participants.*" § 3B1.2 Commentary (n. 3) (emphasis added). The Background Commentary likewise states that the section applies to "a defendant who plays a part in committing the offense that makes him substantially less culpable *than the average participant.*" *Id.* (Emphasis added.) The Commentary, therefore, makes clear that whether an individual defendant's role was minor or minimal turns, in large part, upon consideration of the defendant's actual role relative to that of the co-participants and in light of the circumstances giving rise to the crime charged.

Commentary (n. 4) of § 3B1.2 clarifies this understanding, by establishing as follows:

If a defendant has received a lower offense level by virtue of being convicted of an offense significantly less serious than warranted by his *actual criminal conduct,* a

---

**10.** This situation may be analogized to the use of related conduct generally in sentencing. Under this practice, an offender's sentence may be enhanced based on conduct established by a preponderance of hearsay but for which the defen-

dant either has been acquitted or has not been charged. *See United States v. Wise*, 976 F.2d 393 (8th Cir.1992); *United States v. Galloway*, 976 F.2d 414 (8th Cir.1992).

reduction for a mitigating role under this section ordinarily is not warranted because such defendant is not substantially less culpable than a defendant whose only conduct involved the less serious offense.

(Emphasis added.) This provision makes clear that it is not so much the *offense* for which the defendant is charged that is to be considered, as the individual's "actual criminal conduct" relative to that of others involved in the crime. Ingram clearly is not the individual contemplated by Commentary 4 who has been convicted of an offense "significantly less serious than warranted by his actual criminal conduct." He in fact entered a plea to the only charge the evidence likely would support. His case is exactly that anticipated by § 3B1.2(b), and he is entitled to a two-level departure for his minor, mitigating role.

### C. *Family Circumstances*

■ Finally, Ingram's extraordinary family circumstances entitle him to a two-level downward departure from the Guidelines. Section 212(a)(2) of the Sentencing Reform Act of 1984 provides that courts may depart from the Guidelines range where "the court finds there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission."[11] A number of courts have held that extraordinary family circumstances constitute such mitigating considerations. *See e.g., United States v. Shortt,* 919 F.2d 1325, 1328 (8th Cir.1990); *United States v. Johnson,* 964 F.2d 124, 128–30 (2d Cir.1992) (sole responsibility for four young children); *United States v. Alba,* 933 F.2d 1117, 1122–24 (2d Cir.1991) (two children living with disabled, dependent father and grandmother); *United States v. Big Crow,* 898 F.2d 1326, 1331–32 (8th Cir.1990). *But see, e.g., United States v. Mogel,* 956 F.2d 1555, 1565 (11th Cir.1992); *United States v. Thomas,* 930 F.2d 526, 529–30 (7th Cir.1991).

This includes situations where a single parent has full responsibility for his or her children. *See, e.g., United States v. Newell,* 790

F.Supp. 1063, 1064 (E.D.Wash.1992) (six children); *United States v. Gerard,* 782 F.Supp. 913, 914–15 (S.D.N.Y.1992) (two teenage children). Moreover, courts are particularly likely to find that family considerations justify downward departure where the defendant has little or no criminal history, a stable family life, and where the defendant played a relatively minor role in the crime. *See, e.g., United States v. Pena,* 930 F.2d 1486, 1494–95 (10th Cir.1991) (support of infant and minor daughter with infant, where crime involved single aberrant act); *United States v. Handy,* 752 F.Supp. 561, 564 (E.D.N.Y.1990) (three teenage children, where mother had been gainfully employed 13 years and incarceration would threaten children's futures); *United States v. Mills,* 1990 WL 8081 (S.D.N.Y. Jan. 17, 1990) (daughter and two young grandchildren, where defendant had minimal criminal history and peripheral role in offense).

I conclude that, in light of the entire circumstances of this case, Ingram's extraordinary family circumstances constitute such additional considerations not adequately contemplated by the Sentencing Guidelines. Ingram has stable employment, a negligible criminal history, and played an relatively minor role in the crime charged. Based on the testimony at the presentence hearing and the totality of the circumstances, it is evident that unless Ingram continues to maintain a stable household for his mother and children, protects the boys from their violent mother, and provides them with financial, emotional, and moral support, society more likely than not will · be burdened with two additional young people in the criminal justice system. The risk of this danger simply is too great to justify sentencing Ingram to a pyrrhic four additional months in jail.

### III.

The statute establishing the Guidelines, 18 U.S.C. § 3553(a)(6), specifically permits *"individualized sentences* when warranted by

---

11. *See* 18 U.S.C. § 3553(b); *see also* U.S.S.G. Manual, Ch. 1, Pt. A, 4(b) (Intro.) at 5–6 ("When a court finds an atypical case, one to which a particular guideline linguistically applies but

where conduct significantly differs from the norm, the court may consider whether a departure is warranted.").

mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." *See United States v. Merritt,* 988 F.2d 1298, 1307 (2d Cir.1993). Ingram's plea agreement likewise provides that Ingram's sentence "may include additional considerations, including *but not limited to*" those outlined in the Guidelines Manual. Plea Agreement ¶ 4.

Both the Guidelines and the terms of Ingram's plea agreement therefore require overall consideration of Ingram's actual role in the offense (insofar as it is discernable within the troubled prosecution of this case), Ingram's proven prospects for gainful employment and rehabilitation, and the ultimate fate of his two young boys. They also require examination of the deeply flawed investigation and prosecution, including the prosecution's contradictory testimony and documentary evidence, the withholding of *Brady* material, the acquittal of Copeland and the mysterious disappearance of Harrison, who owned the apartment, reimbursed Ingram, took off for North Carolina and never was charged.

The question that confronted me when I imposed sentence on Ingram, then, isolating each defined factor as required by the Sentencing Commission, was whether the Guidelines obligated me to follow the original recommendation of the Probation Officer (who had not lived through the twists and turns of the two trials or witnessed the prosecution's manipulation of the evidence) and sentence Ingram to an additional four months of home detention.

The foregoing facts and analysis satisfied me that the Guidelines impose no such obligation. Nothing in the Guidelines suggests that the Commission anticipated the total circumstances revealed by this sentencing record. Ingram was not unpunished. He was arrested, endured two long trials, was incarcerated for four and one half months between trials, and remains subject to stringent conditions of supervised release. Service of a minimum of four additional months would have taken Ingram away from his work, his promising progress in kicking his drug habit, and his parenting. Even home detention could have seriously impaired his ability to keep his boys out of trouble. Accordingly, after an evidentiary presentence hearing and for reasons stated in this memorandum, I imposed a sentence of time served with vigorous conditions of supervised release.