UNITED STATES of America, Appellant,

v.

Cynthia JOHNSON, Defendant–Appellee.

No. 914, Dockets 91–1515(L), 91–1541.

United States Court of Appeals, Second Circuit.

Argued Feb. 6, 1992.
Decided May 14, 1992.

Peter K. Vigeland, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty., and Daniel C. Richman, Ass't U.S. Attys. of counsel), for appellant.

Douglas F. Eaton, New York City, for defendant-appellee.

Before: OAKES, Chief Judge, CARDAMONE and PIERCE, Circuit Judges.

OAKES, Chief Judge:

The United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom. The government asks us, on this appeal, to reverse a sentencing judge's exercise of downward flexibility on behalf of an infant and three young children who depend entirely upon the defendant for their upbringing. Cynthia Johnson was convicted of conspiracy, bribery, and theft of public money, in violation of 18 U.S.C. §§ 371, 201(b)(2)(B) and 641 (1988), in a judgment of the United States District Court for the Southern District of New York, Robert P. Patterson, *Judge.* The United States appeals the sentence, which was imposed pursuant to a thirteen-level downward departure for Johnson's family circumstances and for the nature of her offense. We affirm.

## FACTS

In the spring of 1989, Cheryl Purvis, a payroll clerk at the Bronx V.A. Hospital, told her co-worker Cynthia Johnson and two others about a scheme Purvis had concocted to steal money by inflating paychecks. By writing pay increases for herself and others on a standard pay adjustment form, listing the correct social security number but a fictitious name with the correct first three letters of the last name, Purvis was able to secure inflated paychecks. Johnson and the others accepted Purvis's offer to inflate their paychecks, and shortly thereafter Johnson began offering the same to other hospital employees. In return, Purvis and Johnson received fifty percent kickbacks from the employees whose paychecks they inflated. In all, fifteen employees participated in the scheme, receiving a total of approximately $89,222.

The criminal complaint against Purvis and Johnson charged them with stealing money from the government in violation of 18 U.S.C. § 641 (1988). The indictment added a charge of bribery in violation of 18 U.S.C. § 201 (1988), because the defendants' conduct, while at essence a theft, insofar as it involved the acceptance of kickbacks fitted within the statutory definition of bribery. After a jury trial, the defendants were convicted on all counts except one that had been dismissed upon consent.

Judge Patterson calculated Johnson's sentence as follows. The base offense level for the bribery counts, under U.S.S.G. § 2C1.1(a), was ten. The judge then added two levels because Johnson committed more than one bribe, id. § 2C1.1(b)(1); added five levels because the total amount of the bribes exceeded $40,000, id. §§ 2C1.1(b)(2)(A), 2F1.1(b)(1)(F); added four levels for Johnson's role as an organizer of the criminal activity, id. § 3B1.1(a); and added two levels for obstruction of justice, id. § 3C1.1. These adjustments increased the offense level by thirteen levels, from ten to twenty-three.

The court then proceeded to decrease the offense level. Because Johnson's crime, though technically classifiable as a bribery, "more closely resembl[ed] theft than bribery," the court subtracted two levels. The court deducted one more level because the proceeds of the crime were divided with Purvis. Turning to Johnson's family circumstances, Judge Patterson made the following findings:

> The defendant is a single mother.... Her [institutionalized] daughter, age 21 is ... the mother of a six-year-old child who currently resides with the defendant. Also residing with the defendant in Florida is her son, Lamont, and two children aged six and five, as well as her youngest child, who is five months old. The father of this child is unemployed and resides in Queens, New York.... There are no signs of use [of] drugs or alcohol, and she apparently has no mental or emotional health problems.

Concluding that Johnson was solely responsible for the upbringing of four young children, Judge Patterson deducted ten levels. Thus, a total downward departure of thirteen levels yielded a final offense level of ten. The court sentenced Johnson to six months of home detention, followed by three years of supervised release, and restitution of $27,973.

## DISCUSSION

### I. *Downward Departure for Family Circumstances*

The government would have us hold that family circumstances, taken alone, can never justify a downward departure. This position flows from a misreading of the Sentencing Guidelines, and we reject it. The government's argument relies almost entirely on a policy statement issued by the Sentencing Commission, which provides that "[f]amily ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6, p.s. Therefore, we first examine the weight courts should give to such policy statements.

## A

■ The policy statements issued by the Sentencing Commission do not fit neatly into any of the usual categories of legal authority. On the one hand, they warrant greater attention than does ordinary legislative history, because Congress specifically directed sentencing courts to consider the policy statements. By statutory mandate, "[t]he court, in determining the particular sentence to be imposed, shall consider ... any pertinent policy statement issued by the Sentencing Commission." 18 U.S.C. § 3553(a) (1988). Moreover, the policy statements are approved by the Sentencing Commission as a whole, and Congress had the policy statements before it when it approved the Guidelines and amendments thereto. *See* United States Sentencing Commission, Sentencing Guidelines and Policy Statements (April 13, 1987); United States Sentencing Commission, 1990 Annual Report 1, 23.

On the other hand, as many courts have noted, the policy statements cannot be viewed as equivalent to the Guidelines themselves. *See, e.g., United States v. Lee,* 957 F.2d 770, 772–73 (10th Cir.1992) (policy statements are "advisory"); *United States v. Blackston,* 940 F.2d 877, 893 (3d Cir.) ("Whereas guidelines are binding on the courts, policy statements are merely advisory."), *cert. denied,* — U.S. ——, 112 S.Ct. 611, 116 L.Ed.2d 634 (1991). *Cf. United States v. Anderson,* 942 F.2d 606, 609–14 (9th Cir.1991) (en banc) (Sentencing Commission's commentary must be treated as something more than legislative history but less than Guidelines).

Congress was careful to distinguish Guidelines from policy statements. *Compare* 28 U.S.C. § 994(a)(1) (1988) (Guidelines are "for use of a sentencing court in determining the sentence to be imposed in a criminal case.") *with* 28 U.S.C. § 994(a)(2) (1988) (Policy statements are instructions "regarding application of the guidelines or any other aspect of sentencing or sentence implementation."). As one judge explained, "Congress must have envisioned a difference between guidelines and policy statements or it would not have made the distinction." *United States v. Gutierrez,* 908 F.2d 349, 353 (Heaney, J., dissenting), *vacated by an equally divided court,* 917 F.2d 379 (8th Cir.1990) (en banc). Only the Guidelines themselves need be submitted to Congress for approval, not the Commission's policy statements. 28 U.S.C. § 994(p) (1988). When the Commission submitted its initial Sentencing Guidelines to Congress in 1987, it submitted policy statements as well, including section 5H1.6, the policy statement at issue in the present case. *See* United States Sentencing Commission, Sentencing Guidelines and Policy Statements 5.26 (April 13, 1987). Nevertheless, the statute required only the Guidelines to be submitted, and we consider that distinction significant as an indication of the relative weight Congress would have us accord Guidelines and policy statements. *Cf. United States v. Stinson,* 957 F.2d 813, 815 & n. 2 (11th Cir.1992) (per curiam) ("[W]e must be mindful of the limited authority of the commentary," because "the commentary is never officially passed upon by Congress," and because "[w]e assume that the commentary does not go through the same intensive review process as the guidelines themselves."). In sum, while policy statements should aid courts in interpreting the Guidelines, sentencing courts must take care not to give those statements undue weight.

■ We acknowledge that other circuits have at times relied heavily on the Sentencing Commission's commentary, *see, e.g., United States v. DeCicco,* 899 F.2d 1531, 1537 (7th Cir.1990); *United States v. Rutter,* 897 F.2d 1558, 1561 (10th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 88, 112 L.Ed.2d 60 (1990); *United States v. Ofchinick,* 877 F.2d 251, 257 (3d Cir.1989); and that the Supreme Court gave a policy statement substantial weight in *Williams v. United States,* — U.S. ——, 112 S.Ct. 1112, 1119–20, 117 L.Ed.2d 341 (1992). We are nonetheless persuaded that courts must carefully distinguish between the Sentencing Guidelines and the policy statements that accompany them, and employ policy statements as interpretive guides to, not substitutes for, the Guidelines themselves.

■ One area where policy statements, properly used, can aid sentencing courts is in the determination whether to depart from a Guidelines sentencing range. Congress explicitly provided for sentencing departures in the Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551–3586, 28 U.S.C. § 991–998 (1988). A district court, according to the statute, may depart from the applicable guideline range if it finds a circumstance "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b) (1988). *See also* U.S.S.G. §§ 1A4(b), p.s., 5K2.0, p.s.; *Williams*, 112 S.Ct. at 1118. Policy statements, inasmuch as they are issued by the Commission itself, give a strong indication of what the Commission has, in fact, considered. Congress included policy statements in its list of items a court may consider in making the determination of what the Commission has adequately taken into consideration. 18 U.S.C. § 3553(b) (1988) ("In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission."). *See also* U.S.S.G. § 1B1.7 ("As with a policy statement, ... commentary may provide guidance in assessing the reasonableness of any departure from the guidelines."). Despite their usefulness, however, the policy statements do not render the statutory standard superfluous. The central question in any departure decision must be the one imposed by the statute: Is there an aggravating or mitigating circumstance not adequately taken into consideration by the Sentencing Commission?

### B

■ We now apply that standard to the question of family circumstances. The policy statement of U.S.S.G. § 5H1.6, viewed as an aid in determining what the Commission has considered, leads us to the unsurprising conclusion that the Commission took ordinary family responsibilities into account when formulating the Guidelines. The Sentencing Commission understood that many defendants shoulder responsibilities to their families, their employers, and their communities. Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration. The Commission made this clear by explaining that such disruption of the defendant's exercise of responsibility, as a general matter, should not be cause for downward departure: "Family ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6, p.s.

Courts have consistently held that ordinary family responsibilities do not warrant departure. The Eleventh Circuit, for example, recently affirmed a district court's refusal to depart for family circumstances, explaining: "Here [defendant] 'has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts ... parental relationships.'" *United States v. Cacho*, 951 F.2d 308, 311 (11th Cir.1992) (quoting *United States v. Daly*, 883 F.2d 313, 319 (4th Cir. 1989), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990)). *See also United States v. Carr*, 932 F.2d 67, 72–73 (1st Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 112, 116 L.Ed.2d 82 (1991); *United States v. Headley*, 923 F.2d 1079, 1082–83 (3d Cir.1991); *United States v. Brewer*, 899 F.2d 503, 508–09 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); 28 U.S.C. § 994(e) (1988) (Guidelines should "reflect the general inappropriateness of considering the ... family ties and responsibilities ... of the defendant").

Extraordinary circumstances, however, are by their nature not capable of adequate consideration. They therefore may constitute proper grounds for departure. Policy statement 5H1.6 does not alter this conclusion, but simply reinforces what we would have expected in any case: that the Commission, in formulating the guidelines, was aware that incarceration may undermine family responsibilities. The Commission's own words suggest the same. The Com-

mission was careful to specify that family responsibilities "are not *ordinarily* relevant." U.S.S.G. § 5H1.6, p.s. (emphasis added). The Commission thus offered what we may call a "soft" policy statement, rather than one with unequivocal language. If the Commission had intended an absolute rule that family circumstances may never be taken into account in any way, it would have said so. *Compare* U.S.S.G. § 5H1.10, p.s. (imposing absolute ban on consideration of racial and other factors). Section 5H1.6's phrasing confirms the Commission's understanding that ordinary family circumstances do not justify departure, but *extraordinary* family circumstances may. *See United States v. Peña,* 930 F.2d 1486, 1495 (10th Cir.1991). As we explained in *United States v. Sharpsteen,* 913 F.2d 59, 63 (2d Cir.1990), "[t]he clear implication of section 5H1.6 is that if the court finds that the circumstances related to family ties and relationships are extraordinary, it is not precluded as a matter of law from taking them into account in making a downward departure."

Such extraordinary family circumstances were present in *United States v. Alba,* 933 F.2d 1117 (2d Cir.1991). There, the defendant and his wife cared for their four- and eleven-year-old daughters and the defendant's disabled father and paternal grandmother. Noting the special situation of this "close-knit family whose stability depends on [the defendant's] continued presence," we let stand the sentencing court's finding that "incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit" and its conclusion "that these circumstances were sufficiently extraordinary in this case to support a downward departure." *Id.* at 1122. Extraordinary family circumstances are widely accepted as a valid reason for departure. *See, e.g., Peña,* 930 F.2d at 1495; *United States v. Big Crow,* 898 F.2d 1326, 1331–32 (8th Cir. 1990); *United States v. Jackson,* 756 F.Supp. 23, 27 (D.D.C.1991); *United States v. Handy,* 752 F.Supp. 561, 563–64 (E.D.N.Y.1990). *But see United States v. Thomas,* 930 F.2d 526, 530 (7th Cir.), *cert.*

*denied,* —— U.S. ——, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991).

The government points out that each of the cases cited by the defendant involved more than one departure basis, and contends that family circumstances alone never justify a downward departure. Both the Guidelines and our caselaw, however, contemplate departure in extraordinary situations, and we find no reason to believe that a particular family's circumstances can never be extraordinary. Nor do we find any reason to believe that family circumstances warranting departure must include something beyond extraordinary parental responsibilities.

### C

■ To confirm that parental responsibilities can be extraordinary, we need look no further than the circumstances faced by Cynthia Johnson. She faced more than the responsibilities of an ordinary parent, more even than those of an ordinary single parent. Johnson was solely responsible for the upbringing of her three young children, including an infant, and of the young child of her institutionalized daughter. The number, age and circumstances of these children all support the finding that Johnson faced extraordinary parental responsibilities. Johnson's situation, in fact, is substantially more compelling than that of the defendant in *Alba,* whose children were ages four and eleven, and whose spouse could care for their children and elderly dependents. 933 F.2d at 1122.

The rationale for a downward departure here is not that Johnson's family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing. Judge Patterson made it clear that the departure was not on behalf of the defendant herself, but on behalf of her family:

In view of the special circumstances of the defendant—I shouldn't say "defendant," I should say of the "defendant's family," which, as the court sees it, is a family in which the mother is the sole link between the children, the six-month-

old child ... and having the father in Queens who does not contribute to the support of the five- and six-year-old children, ... a 17–year–old boy having a father who does not contribute to his support, and a six-year-old grandchild whom the mother is unable to keep because of the circumstances of her having another child, at the age of 21, and living in an institution ... I'm going to reduce the level.

A week later, at Purvis's sentencing, the court explained the Johnson departure: "I did feel that those children being without a mother for an extended period of time was a hardship on them, not on her, hardship on them, and that was extraordinary grounds for a departure."

## II. *Downward Departure for the Nature of the Offense*

### A

■ The district court, finding that Johnson's offense fell outside the heartland of bribery cases, *see* U.S.S.G. § 1A4(b), p.s., deducted three levels to reach a level "more appropriate for a sentence for the crime for which the defendant has been convicted." Judge Patterson attributed two of those points to "the degree to which the crime more closely resembles theft ... than bribery," and one point to "the fact that the proceeds of the conspiracy were divided with another defendant." While conceding the propriety of the court's two-level departure for the crime's closer resemblance to ordinary theft, the government contests the further reduction for Johnson's not having received all the proceeds of the crime.

On this point, the government is correct. The Sentencing Guidelines contemplate that proceed-splitting does not authorize a reduced offense level. *See* U.S.S.G. § 1B1.3(a); *United States v. Cardenas*, 917 F.2d 683, 687 (2d Cir.1990). The Commission's notes offer the following example:

Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000. Defendant G fraudulently obtains $35,000.

Each is convicted of mail fraud. Each defendant is accountable for the entire amount ($55,000) because each aided and abetted the other in the fraudulent conduct. Alternatively, because Defendants F and G engaged in concerted criminal activity, each is accountable for the entire $55,000 loss because the conduct of each was in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable.

U.S.S.G. § 1B1.3, comment. 1(d). Because the Commission specifically addressed the issue of divided proceeds, and decided that the entire amount should be included as part of each defendant's relevant conduct, it cannot be said that Johnson's splitting of proceeds with Purvis amounted to a circumstance "not adequately taken into consideration by the Sentencing Commission," warranting departure. 18 U.S.C. § 3553(b) (1988).

### B

■ Finding an error in the district court's application of the Guidelines does not end our inquiry under 18 U.S.C. § 3742(f) (1988). "Section 3742(f)(1) does not call for a remand every time a sentencing court might misapply a provision of the Guidelines; rather, remand is required only if the sentence was 'imposed *as a result of* an incorrect application' of the Guidelines." *Williams*, 112 S.Ct. at 1120. The Supreme Court recently spelled out the inquiry a court of appeals must make when faced with a departure based in part on improper grounds:

When a district court has intended to depart from the guideline range, a sentence is imposed 'as a result of' a misapplication of the Guidelines if the sentence would have been different but for the district court's error. Accordingly, in determining whether a remand is required under § 3742(f)(1), a court of appeals must decide whether the district court would have imposed the same sentence had it not relied upon the invalid factor or factors.

*Id.*

On the record as a whole, we conclude that the district court would have imposed

the same sentence had it not relied upon the splitting of proceeds by Johnson and Purvis. The sentencing transcript leaves no doubt that the district court departed to a sentence that it considered more appropriate given the anomalous nature of the crime and the court's concern for the defendant's children and grandchild. The court's consideration of Johnson's profit-splitting was therefore harmless. Fed. R.Crim.P. 52(a); *Williams*, 112 S.Ct. at 1120–21. Finally, we are satisfied that Judge Patterson's departure was reasonable. 18 U.S.C. § 3742(f)(2) (1988); *Williams*, 112 S.Ct. at 1121.

Accordingly, the judgment of the district court is affirmed.