UNITED STATES of America

v.

Henry A. GREENE, Defendant.

No. 02 CR 435(SAS).

United States District Court,
S.D. New York.

Jan. 13, 2003.

Peter B. Sobol, Assistant United States Attorney, New York City, for the Government.

Ian Yankwitt, Legal Aid Society, Federal Defender Division, New York City, for Defendant.

### SENTENCING OPINION

SCHEINDLIN, District Judge.

On August 28, 2002, Henry A. Greene pled guilty to thirteen counts of aiding and assisting in the preparation of false income tax returns in violation of 26 U.S.C. § 7206. Greene was sentenced on December 27, 2002. I write now to explain the reasons for that sentence.

### The Offense Conduct

The following fact recitation is drawn from the Presentence Report dated November 8, 2002. Between the years 1994 through 1996, Greene owned and conducted an income tax preparation business known as "Henry A. Greene Tax Service," which was located in the Bronx. During those years, Greene prepared hundreds of federal income tax returns wherein he listed fictitious Schedule A deductions in order to reduce his clients' tax liability. According to an investigative report prepared by a special agent of the Internal Revenue Service ("IRS"), most of the returns contained similar or identical Schedule A deductions, in both category and amount. Specifically, the returns showed deductions for items such as unreimbursed medical expenses, charitable contributions and unreimbursed employee expenses which were not commensurate with the amount of gross income reported.

As part of the IRS's investigation of Greene, special agents interviewed a number of his clients. Most of Greene's clients were unaware that false or inflated deductions had been taken on their behalf. In fact, Greene rarely asked his clients about their contributions or miscellaneous deductions, nor did his clients provide supporting documentation for such deductions. In many cases, Greene did not review the tax returns with his clients and would sign his clients' names prior to submitting the returns to the IRS.

In short, the Government's position is that Greene is responsible for aiding and abetting in the preparation of thirty-nine false tax returns for the calendar years 1994, 1995 and 1996, which resulted in a total tax loss of $51,276.[1]

### Offense Level Computation [2]

Counts one through thirteen are grouped pursuant to § 3D1.2(d) because the offense level is determined largely by the total amount of loss. The base offense level for aiding and abetting a tax fraud is sixteen pursuant to § 2T1.4(a) and the tax table found at § 2T4.1(F), corresponding to a loss of more than $80,000 but less than $200,000. Two levels are added, to eighteen, pursuant to § 2T1.4(b)(1)(B) because the defendant was in the business of pre-

---

1. At sentencing, the Government argued that the total tax loss based on all of Greene's relevant conduct was higher than the $51,276 figure contained in the Presentence Report. Specifically, the Government argued that Greene filed approximately 522 tax returns, 123 of which revealed similar indicia of fraud. *See* Sentencing Transcript at 6. The average tax loss for the 39 tax returns analyzed by the IRS special agent and accepted by the Probation Department was $1,314.77. *See id.* at 12. Multiplying the average tax loss of $1,314.77 by 123 yields a total tax loss of $161,716.71. The Guidelines tax table has cut-offs at more than $80,000 and more than $200,000. Erring on the side of caution, I

computed the additional amount of tax loss needed to reach offense level 16, the appropriate offense level. *See id.* at 35. This required an additional loss figure of $29,000 ($51,276 + $29,000 = $80,276). Dividing $29,000 by 84 yields an average tax loss of $345 for the additional returns. Rounding up, I found the approximate tax loss to be $360 per return for the 84 returns, resulting in a total tax loss of more than $80,000 and a base offense level of 16. *See id.* at 36.

2. Unless otherwise noted, all references to " § —" are to the United States Sentencing Guidelines effective November 2, 2002.

paring and assisting in the preparation of tax returns. This level is decreased by three levels, to fifteen, pursuant to § 3E1.1(a) and (b)(2), in recognition of Greene's acceptance of responsibility, resulting from his guilty plea as well as his subsequent conduct.

## Criminal History Category

Greene was convicted in 2002 for harassment in the second degree for which he was sentenced to a conditional discharge, resulting in zero criminal history points. Thus, he falls in Criminal History Category I.

## Applicable Guidelines Range

The sentencing guideline range for offense level fifteen, Criminal History Category I, is eighteen to twenty-four months in custody.

## Downward Departures

### A. Extraordinary Charitable Works and Community Service

■ Greene has moved for a downward departure based on his extraordinary history of charitable work and community service. In so doing, Greene cites his lifetime commitment to children in need demonstrated, in part, by his volunteering as a foster father and eventually adopting six underprivileged children. The Government opposes such a departure.

■ Section 5H1.11 of the Sentencing Guidelines state that "civic, charitable, or public service ... and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." Thus, the Guidelines treat charitable works as a discouraged basis for departure. Nonetheless, as explained by the Supreme Court, a court may still depart "if the [discouraged] factor is present to an *exceptional degree* or in some other way makes the case different from the ordinary case where the factor is present." *Koon v. United States,* 518 U.S. 81, 96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (emphasis added). This is clearly such a case.

The main thrust of the Government's argument against a charitable works departure is that it is relatively easy for the typical defendant in a white collar case to be charitable. The Government points to examples of philanthropists who have made large financial contributions to their communities over a sustained period of time. However, Greene's contributions are distinctly different. Although he committed a white collar crime, and while he himself is a white collar employee, he is at the lowest end of the scale. He is a salaried employee in a law firm where he works as a file clerk. He is not a wealthy man. Greene's charity, however, did not take the form of financial contributions made by wealthy defendants. Rather, Greene, a man of modest means, gave a much more valuable commodity, his time. In fact, Greene has devoted his entire life, all day every day, to parenting very disturbed and hard to place orphaned children. Greene's level of commitment to good works is truly extraordinary.

Greene joined Big Brothers, Big Sisters of America in 1969 where he served as a mentor for disadvantaged youth in Big Brothers Group Homes. In 1981, Greene registered with the Sheltering Arms Children's Services as a pre-adoptive foster parent. Greene was particularly interested in raising "hard to place" children—typically, children over ten years of age with an emotional and/or physical disability. Shortly thereafter, Greene, as a single parent, adopted six underprivileged boys and raised each one of them in an extraordinarily responsible manner. In 1982, Greene adopted Eric Pitts at the age of sixteen and Ronald and George Young, adopted at ages seven and eight, respec-

tively. Between 1993 and 1999, Greene adopted his youngest sons: Raymond Sanchez (adopted at age twelve); Jerome Rolike (adopted at age seven after his mother died of AIDS); and Quentin Foster (adopted at age twelve).

The type of children Greene adopted is a further accolade to his generosity of spirit. Greene's youngest son, Quentin, is moderately mentally retarded and attends a special educational program at a Bronx public school. He also has a severe visual impairment. Quentin attends speech therapy and receives individual counseling and training at a special school. Greene is the sole financial and emotional support for this disabled child. Jerome graduated from Cardinal Hayes High School and is now attending Medgar Evers College. This is an amazing success story given Jerome's early history of being moved from home to home. Jerome lives with Greene and remains dependent on him. Raymond was born addicted to heroin and cocaine. As a child, he went through many family placements and had many problems. Under Greene's care, Raymond is now doing well in a Culinary Arts Program at Park West High School. He still resides with and is dependent on the defendant. George Young suffered a tragic accident at age seventeen when he was hit with a stray bullet. Despite a physical disability, he graduated from Cardinal Hayes high school. As a result of the shooting, George has a punctured stomach and is on disability. However, Greene continues to provide additional financial support to George and remains a vital part of his life.

In sum, defendant remains financially and emotionally responsible for three sons and has done exceedingly well in adopting and caring for six otherwise homeless boys over the years. In this Court's experience, Greene's record is truly extraordinary and warrants a downward departure

in its own right. This is the rare case where charitable works alone entitle a defendant to a downward departure.

Greene's record is far more compelling than the facts found in *United States v. Acosta,* 846 F.Supp. 278 (S.D.N.Y.1994), a case cited by the Government for the proposition that a charitable works departure is only appropriate if some other factor is present. In *Acosta,* the defendant rescued a baby from a burning building when he was fifteen years old. *See id.* at 279 For this act of bravery he was commended by the Fire Department, the City Council, the Borough President for the Bronx, and his Congressman. *See id.* Some time later, Acosta pled guilty to attempted robbery at gunpoint. *See id.* at 278. The defendant then sought a downward departure based on his previous act of heroism. The court departed but its decision to do so was not based solely on Acosta's charitable act but was also influenced by the fact that Acosta was mentally retarded. *See id.* at 280 ("Acosta's life saving, heroic act in itself justifies such a departure but certainly does so when considered in combination with his retarded mental condition."). By contrast, and without denigrating Acosta's single heroic act, Greene has devoted his *entire life* to good works by providing a home for six troubled boys. This lifetime commitment, day in and day out, is far more extraordinary than a single spontaneous heroic act. For these reasons, Greene is entitled to a downward departure for his charitable works.

### B. Extraordinary Family Circumstances

■ Greene has also moved for a departure based on extraordinary family circumstances. As with extraordinary charitable works, this is also a discouraged ground for departure, one which is only given in extraordinary cases. *See* § 5H1.6 ("Fami-

ly ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."); *see also United States v. Johnson,* 964 F.2d 124, 129 (2d Cir.1992) ("Section 5H1.6's phrasing confirms the Commission's understanding that ordinary family circumstances do not justify departure, but extraordinary family circumstances may."). The intended beneficiary of a family circumstances departure is not the defendant but his dependents. *See Johnson,* 964 F.2d at 129 ("The rationale for a downward departure here is not that [defendant's] family circumstances decrease [his] culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."). Sentencing courts must therefore focus on the vulnerability of these dependents, assessing the hardships that a sentence of incarceration would impose on them. Accordingly, courts have granted departures on this ground where it is clearly established that the defendant is a *unique* source of financial and/or emotional support for a significant number of dependents. *See, e.g., United States v. Faria,* 161 F.3d 761, 762 (2d Cir.1998) ("[W]e have upheld downward departures based on family circumstances 'where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments.' ") (quoting *United States v. Sprei,* 145 F.3d 528, 535 (2d Cir.1998)); *United States v. Galante,* 111 F.3d 1029, 1037 (2d Cir.1997).

The Government opposes such a departure, arguing that "[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." *Johnson,* 964 F.2d at 128. In addition, the Government cites a recent district court case, *United States*

*v. Castano–Vargas,* 124 F.Supp.2d 185, 193 (S.D.N.Y.2000), which recognized that "the just and deserved punishment of the defendant will often be felt just as deeply by his family members." According to the Government, "[t]he harsh impact on innocent family members is, however, the inevitable result of imprisonment for defendants with families." *Id.*

With this background, the Government argues that Greene's status as just another single parent of three children does not represent an extraordinary circumstance. The Government is simply wrong. Greene is not just another single parent and the situation is not the same as that of a natural parent of three children. Greene's children have been terribly scarred, both emotionally and physically, by their turbulent childhoods. For example, Raymond was born addicted to heroin and cocaine. Raymond's first foster care placement ended when his foster father died when he was three years old. He then was placed in a series of temporary foster homes and finally placed with the Gallion family. Because his new foster father also died when Raymond was approximately seven, his foster mother returned him to the care of St. Dominics Children's Services. Over the next six years, Raymond was placed in two additional homes but was returned to St. Dominics each time. Finally, he went to live with Greene where he has thrived for the past nine years. This is not the story of a typical child. Raymond is more emotionally dependent on Greene than a child with a stable upbringing ever could be. This itself is an extraordinary family circumstance—to be the sole emotional and financial support for such an emotionally vulnerable child. But Greene has two more children, each equally deserving and in desperate need of a parent's love.

Jerome's natural mother died of AIDS when he was an infant. He was taken in

by the Sheltering Arms Children's Services who found him difficult to place because no one wanted a child of a mother who had died of AIDS. Greene took Jerome in when he was seven years old, after years of temporary placements. Like Raymond, Jerome has many problems, but at least he has a stable father-figure in Greene. This too is extraordinary.

Finally, there is Quentin, defendant's youngest son. He was not adopted until age twelve. He is moderately mentally retarded and is placed in special education classes as a result. He is also visually impaired. Once again, this is not a typical child of a single parent. Quentin has had a hard life and Greene is his sole emotional and financial support.

These family circumstances—where the defendant is the sole financial *and* emotional support for children in such desperate need of some stability—warrant a downward departure when viewed in isolation. Because defendant's charitable works and extraordinary family circumstances warrant a departure standing alone, there is no question that the combination of these two factors also warrants a departure. *See United States v. Broderson,* 67 F.3d 452, 459 n. 1 (2d Cir.1995). Accordingly, a seven-level departure, to level eight, is justified.

■ The Second Circuit has instructed district courts to provide sufficient reasons to justify the magnitude of any given departure. *See United States v. Barresi,* 316 F.3d 69, 72 (2d Cir.2002). The reasons for a downward departure have already been explained. Those same reasons clearly support a non-custodial sentence and a sentence that does not substitute an alternative form of confinement in lieu of imprisonment.[3] *First,* because Greene is the sole provider of financial and emotional support for his three sons, any period of incarceration would risk causing grievous harm to his particularly vulnerable children. If Greene were imprisoned, his sons would again be placed in foster care, albeit temporarily. Given their histories, such placement would destroy the stability they have come to enjoy under Greene's care. *Second,* a sentence of probation, when coupled with the order of restitution, is sufficient to serve the twin aims of deterrence and retribution. *Third,* it is highly unlikely that Greene will repeat his criminal conduct given that he is sixty-five year old and previously had no criminal history points. For all of these reasons, *any* period of incarceration would be inappropriate.

At offense level eight, Criminal History Category I, defendant's guidelines range is zero to six months in custody.

**The Sentence**

In light of the above, Greene is sentenced to three years of probation. In addition, he is required to pay a mandatory assessment of $950, which payment is due immediately. Moreover, restitution in the amount of $51,276 shall be paid to the IRS at the rate of ten percent of defendant's gross monthly earnings throughout the period of probation. No fine is imposed because there is no realistic possibility that defendant will be able to pay both a fine and restitution.

Defendant is to be supervised in the district of his residence and the standard conditions of probation as recommended by the Probation Department shall apply. In addition, the usual mandatory conditions shall apply including: 1) defendant shall not commit another federal, state or

---

**3.** Given Greene's familial responsibilities, some of which are unpredictable, and the many locations to which he must travel in order to meet those obligations, home detention, with or without electronic monitoring, is not feasible.

local crime; 2) defendant shall not illegally possess a controlled substance; and 3) defendant shall not possess a firearm or other destructive device.

The mandatory drug-testing condition is suspended due to the imposition of a special condition requiring drug treatment. The following special conditions are imposed: (1) defendant shall participate in a substance abuse program approved by the U.S. Probation Department which may include testing to determine whether defendant has reverted to the use of drugs and/or alcohol; (2) defendant shall provide the Probation Department with full access to any requested financial information; and (3) defendant shall no longer engage in the further preparation of income tax returns other than his own or those of his adult children. Finally, defendant is to report to the nearest Probation Office within seventy-two hours of release from custody.

SO ORDERED.