**UNITED STATES of America**

v.

**Marlo WHITE, Defendant.**

**No. S1 02 Cr. 939(DC).**

United States District Court,
S.D. New York.

Jan. 30, 2004.

David N. Kelley, United States Attorney for the Southern District of New York by

Laura Grossfield Birger, Esq., Assistant United States Attorney, New York City, for Plaintiff U.S.

Stephens, Baroni, Reilly & Lewis, LLP by Stephen R. Lewis, Esq., White Plains, NY, for Defendant Marlo White.

### MEMORANDUM DECISION

CHIN, District Judge.

In this case, defendant Marlo White has pled guilty to bank robbery. She has admitted acting as a lookout during a violent robbery of a bank in Yonkers. Two men, dressed in black and wearing masks, burst into the bank, pointed guns and screamed at customers and tellers, and made off with thousands of dollars. One of the assailants was killed in a subsequent shootout with the police.

White is before the Court for sentencing. Under the Sentencing Guidelines, she faces a prison term of 57 to 71 months. White has moved, however, for a downward departure below the Guidelines range to a term of probation and home confinement because of her family circumstances—she is the 29–year old mother of five children, ranging in age from 5 to 13 years, and she also has legal custody of her 14–year old sister. Hence, she is responsible for the care of six young children, and if she is sent to prison the children are likely to be placed in foster care.

Because White's family circumstances are extraordinary, I have the discretion to downwardly depart from the sentencing range. In attempting to fashion a fair and just sentence, I must consider the impact that a prison term will have not only on White but on her five young children and sister. At the same time, other sentencing considerations—including the seriousness of the crime and the need for deterrence—weigh in favor of the imposition of a substantial term of imprisonment.

For the reasons that follow, the motion for a downward departure is granted, but only to the extent set forth below. White will be sentenced to a term of imprisonment.

### STATEMENT OF THE CASE

#### A. The Facts

The following constitute my findings of fact, drawn from White's plea allocution, the materials submitted in connection with the sentencing, including the presentence report (the "PSR"), and the evidence presented at the trial of *United States v. Vernon Snype.*

#### 1. The Bank Robbery

On July 6, 2002, two men robbed the First Union National Bank in Yonkers. Armed with guns and wearing black outfits, including black masks and gloves, they threatened to shoot and kill the employees and customers of the bank and they pushed an elderly woman to the floor. They filled two bags with some $35,000 and then fled, driving away in a car they had stolen earlier that morning at gunpoint from a parking lot after handcuffing the parking attendant to a pipe.

A high-speed chase ensued on the Major Deegan Thruway, as the police pursued the two men from Yonkers to the Bronx. The men fired shots at the police officers following them on the highway. The car crashed in the Bronx, and the chase continued on foot as the two men ran, in opposite directions. One of the two—William Partlow—was killed in a shootout with the police. The other—Vernon Snype—escaped, only to be arrested several days later.

During the robbery, White sat outside the bank in a car with her cousin, Marisa Hicks. They were acting as lookouts. With them in the back seat—during the

robbery—was Hicks's baby. As made clear by a statement White gave the police after her arrest and by her plea allocution, at a minimum, White knew in advance that she would be assisting Snype in some kind of a robbery. She had been told that she would be paid $250 for doing so. Her task was to help Hicks alert Snype if police officers appeared. At a minimum, White realized, as the robbery was about to begin, that Snype and another man were going to rob a bank. In fact, she saw the two men, dressed in black, wearing masks, apparently with a gun, enter the bank. Hicks was on a cell phone with Snype while the robbery unfolded, and she told White that people were screaming in the bank. White did not leave but continued to act as a lookout.

More likely than not, White knew more than she has admitted. The phone records show that she and Hicks spoke to each other twice on July 5, 2002, the day before the robbery. More significantly, the telephone records show that between 5:30 a.m. and 6:15 a.m. on July 6th, Snype and White spoke to each other 13 times, with White calling Snype five times and Snype calling White eight times. Hence, White undoubtedly knew in advance that this was going to be a bank robbery. White also spoke with Hicks by telephone 25 times on July 6th.

Also acting as a lookout during the robbery was Cornell McCloud, who was sitting in his own car nearby.

### 2. The Aftermath

After the robbery, White continued to play a role. She and Hicks met Snype and remained with Snype as he tried to locate Partlow, unaware that Partlow had been killed. She also was present when Snype met up with McCloud. She participated as Snype and McCloud located Partlow's car (in which Snype had left his wallet and keys), and she drove McCloud's car while McCloud drove away Partlow's car to hide it from the police.

The next day, when Snype wanted to find a place to hide his own car, White suggested a storage facility in New Jersey. She then assisted Hicks in renting space at the facility and in storing Snype's car there.

On July 10, 2002, after McCloud and Hicks had been arrested, White contacted the police. She was arrested that night.

On July 11, 2002, Snype was arrested in Far Rockaway, New York, in possession of more than $20,000 of the money stolen from the bank, including bundles of money still wrapped in money bands marked "First Union National Bank." He also possessed two loaded guns, fraudulent identification documents, and papers relating to the storage unit that had been rented by Hicks to hide Snype's car. White's name and address are listed in the storage unit documents.

### 3. White's Personal and Family Circumstances

White is 29 years old. She graduated from high school, completed a business course, and attended one quarter at a community college.

White has five children ranging from 5 to 13 years in age, from three different relationships. One of the children suffers from a behavioral disorder and the youngest is asthmatic. The fathers of the children are not available to take custody of the children: one is in prison; another is an unemployed drug dealer; and although the third occasionally provides some money toward the care of his son, he has not had contact with him. Because White's mother is a crack addict, White also has legal custody of her 14–year old sister.

As a child, White lived with her mother and her mother's boyfriend; White con-

tends that her mother's boyfriend sexually abused her. While growing up, White saw her father only once and was told that he was her godfather. Recently, White has renewed a relationship with her father, a 53–year old truck driver, and her father put his house up as collateral to secure White's release on bail.

White was the only child of her father and mother. Her father has five other children, but White does not know these half-siblings. White's mother has three other children, including the 14–year old living in White's household. The other two half-siblings are only 23 and 21 years old and do not appear to be suitable caregivers for the six children.

White's five children and her sister live with her in New Jersey, where they attend school. In a letter submitted to the Court recently, White describes the children as doing well in school and maintaining B or B+ averages. The PSR describes the home as "an adequately maintained multi-bedroom apartment within a private home." (PSR ¶ 60). White has been employed on a part-time basis, with a retail store since June 2001, first as a cashier and then as a phone operator. She worked as a cashier on and off for some years before that. She receives approximately $630 per month in food stamps and rent subsidies.

White has one prior conviction: when she was 22 years old, she was convicted of credit card fraud and was sentenced to a $225 fine. While employed at a department store, she rang up a sale for a friend who was using a stolen credit card.

## B. *Prior Proceedings*

McCloud and Hicks have pled guilty. Snype went to trial, and on October 9, 2003, a jury convicted him of conspiracy to commit bank robbery. The jury was unable to reach a verdict on three other counts, including a count charging the substantive crime of bank robbery. I declared a mistrial as to the three counts.

On September 26, 2003, White pled guilty to the crime of bank robbery. At her plea allocution, White stated that she knew she was going to be a lookout with her cousin, but that she did not know for what. She claimed that once she learned that the robbery was of a bank, she stopped acting as a lookout. (9/26/03 Tr. at 14–17). Upon further questioning, however, she admitted otherwise:

THE COURT: Okay, I am going to ask you again.

You told me that you were going to be a lookout.

THE DEFENDANT: Yes.

THE COURT: Did you know that you were going to be a lookout for a bank robbery?

THE DEFENDANT: Yes.

THE COURT: Did you know that before you got there?

THE DEFENDANT: No.

THE COURT: You knew that when you got there?

THE DEFENDANT: Yes.

THE COURT: From what Ms. Hicks told you?

THE DEFENDANT: Yes; when she was on the phone with him.

THE COURT: Once you learned that there was going to be a bank robbery, did you continue to participate as a lookout?

THE DEFENDANT: Yes.

THE COURT: And was it your intention to assist in the bank robbery by being a lookout?

THE DEFENDANT: Yes.

(*Id.* at 18–20).

I saw the parties for sentencing on January 16, 2004. The principal issue was White's motion for a downward departure

for extraordinary family circumstances. White was given the opportunity to speak and she stated as follows:

> THE DEFENDANT: ... Your Honor, I understand what I did was wrong. I didn't know it was going to turn out for me this way. If I could change it, I would.
>
> I'm a single mother of five kids, with custody of my sister. I'm not saying I need your sympathy for that, but if I am to go to jail, my kids have nobody. I don't want them to come out the way I came out. I don't want them to be victimized. I don't want anything wrong to happen to them, but I do understand what I did was wrong.
>
> THE COURT: Did you not think about that when you were sitting in that car?
>
> THE DEFENDANT: Your Honor, to be honest, no. I never thought it was going to turn out to be what it was.
>
> THE COURT: Why didn't you walk away as soon as you learned that there was a bank robbery?
>
> THE DEFENDANT: I ask myself that a thousand times, why didn't I walk away. But I stayed because my cousin asked me not to leave her. I trusted her. I never thought that I would be put in harm's way that way. I never thought that actually nobody could commit such a thing and think it was all right.
>
> Like I said, I could have left, but I didn't. And I do apologize for that. I apologize to my lawyer for not cooperating with him and not speaking to him when I needed to speak to him, because in my own words I just thought of how it was just me and my kids and nobody else. But as I stand here today, I know now that he is the one who is trying to help me be there for my kids, and I just ask you to give me one more chance,

your Honor. I promise I will never make a mistake like that again.

(1/16/04 Tr. at 10–11).

I concluded that White's family circumstances were extraordinary, but I reserved decision on the issue of whether to depart. (*Id.* at 4, 12).

## C. *The Guidelines Calculation*

White pled guilty pursuant to a plea agreement that stipulated to a Total Offense Level of 25 and a Criminal History Category of I for a sentencing range of 57 to 71 months. In the PSR, however, the Probation Department recommended an upward two-level adjustment in the offense level, pursuant to § 2B3.1(4)(B), because Snype and Partlow had handcuffed the parking lot attendant to a pipe when they stole the vehicle the morning of the robbery. The Probation Department also recommended not giving White a three-level downward adjustment for acceptance of responsibility pursuant to § 3E1.1 because it believed she had not been forthcoming at her plea allocution or in her presentencing interview. Consequently, the PSR calculated the Total Offense Level as 30. With the Criminal History Category of I, the PSR set forth a Guidelines range of 97 to 121 months.

The Government has not requested the two-level enhancement pursuant to § 2B3.1(4)(B), nor is it opposing the three-level downward adjustment for acceptance of responsibility. As I noted on January 16, 2004, without expressing a view on the correctness of the Probation Department's positions, I will accept the parties' agreement. Hence, I conclude that the Total Offense Level is 25, the Criminal History Category is I, and the Guidelines Range is 57 to 71 months.

## DISCUSSION

### A. Family Circumstance Departures

In imposing sentence, a court must consider: the circumstances of the crime; the history and characteristics of the defendant; the need to promote respect for the law; the traditional goals of retribution, deterrence, protection, and rehabilitation; the range of sentences established by the Sentencing Commission for similar crimes; and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a); see generally United States v. Brown, 381 U.S. 437, 458, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) ("Punishment serves several purposes: retributive, rehabilitative, deterrent—and preventative.").

■ A defendant's family circumstances are part of her history and characteristics and hence are relevant to the Court's decision where to sentence her *within* the applicable Guidelines range. The Sentencing Guidelines provide, however, that a defendant's "[f]amily ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6 (2003).[1] "[O]rdinary family responsibilities" are not a proper basis for a departure because the Sentencing Commission took the usual family ties and responsibilities "into account when formulating the Guidelines." United States v. Johnson, 964 F.2d 124, 128 (2d Cir.1992).

■ Where family circumstances are extraordinary, the sentencing court has discretion to depart below the applicable sentencing range. Family circumstances are extraordinary when exceptional hard-

ship to a defendant's family would result from a sentence within the Guidelines range; such circumstances may constitute a "mitigating circumstance ... of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0(a)(1)(A) (2003). *See, e.g., United States v. Galante,* 111 F.3d 1029, 1035 (2d Cir.1997) (upholding departure where defendant provided primary support for two children, his wife spoke limited English, his father was critically ill and on life support in a chronic care facility, his mother was a 66–year old factory worker, and incarceration "would probably ... destroy[ ]" "the family unit"); *Johnson,* 964 F.2d at 129–30 (upholding departure where defendant was sole support of four young children); *United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir.1991) (upholding departure where defendant worked two jobs to support his wife, two children, and grandmother, and his disabled father relied on him to get in and out of wheelchair).

■ A district court's discretion to downwardly depart for extraordinary family circumstances is not absolute. "Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration," *Johnson,* 964 F.2d at 128, and "[i]t is not unusual ... for a convicted defendant's incarceration to cause some hardship in the family." *United States v. Smith,* 331 F.3d 292, 294 (2d Cir.2003). Hence, family circumstance departures were reversed where: the defen-

---

1. Although White committed her crime in 2002, I use the 2003 edition of the Guidelines, as did the Probation Department in preparing the PSR, because there are no substantive differences between the two versions with respect to the issues before the Court. *See* U.S.S.G. § 5H1.6 (2002) (a defendant's "[f]amily ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range").

Under the 2003 edition of the Guidelines, for certain crimes not relevant here, even extraordinary family circumstances are not a basis for departure. *See* U.S.S.G. § 5H1.6 (2003) (offenses involving minor victims).

dant shared responsibilities for raising his son with his wife, even though her college studies were likely to be postponed as a result of his incarceration, *Smith,* 331 F.3d at 294; the defendant provided some support for his three children and ill father, and the defendant was likely to be deported following his release from prison in any event, *United States v. Carrasco,* 313 F.3d 750, 756–57 (2d Cir.2002) ("being the father of three children is in no sense an exceptional circumstance"); and the defendant had six children, but only one of the six was under eighteen and the three older children were available to care for their younger siblings. *United States v. Madrigal,* 331 F.3d 258, 260 (2d Cir.2003) (the " 'very serious problems' " faced by defendant's children were "the common collateral damage of imprisonment").

■ A motion for a downward departure presents the sentencing court with three inquiries: (1) Does the Court have the power to depart? (2) If so, should the Court exercise its discretion to depart? (3) If so, to what extent should the Court depart? *Compare United States v. Naugle,* 879 F.Supp. 262, 264 (E.D.N.Y.) ("a sentencing court considering departing on the basis of 'family circumstances' makes two separate decisions: whether it has the power to depart and, if so, whether it should exercise that power"), *aff'd,* 54 F.3d 765 (2d Cir.1995).

## B. *Application*

I consider each of the three areas of inquiry.

### 1. *Can the Court Depart?*

■ I conclude, as I stated at the hearing on January 16, 2004, that I have the power to depart, for White's family circumstances are extraordinary and her incarceration will result in exceptional hardship to her family.

White is the sole caregiver for six young children, ages 5 through 14. There do not appear to be any adults in the family willing or able to take care of the children if White should go to prison. The Government suggests White's natural father as a possibility, but he is a 53–year old truck driver with his own family who played no role in raising White, his own daughter. It is unrealistic to expect that he could or would suddenly take in five young grandchildren and his ex-wife's 14–year old daughter, when he has never had a relationship with any of them. Even the Probation Department recognizes that White's "children will probably be placed in foster care" if she is incarcerated. (PSR at p. 20).

The facts of this case are more extraordinary than the facts of *Johnson, Alba,* and *Galante,* where family circumstance departures were upheld, and it is hard to imagine family circumstances more compelling than those at hand. The loss of six young children to the New Jersey foster care system surely falls outside the heartland of cases contemplated by the Sentencing Commission; the plight of these children surely constitutes a "mitigating circumstance ... of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0(a)(1)(A) (2003). Hence, I conclude that I have the power to depart.

### 2. *Should the Court Depart?*

The next inquiry is whether I should exercise my discretion to downwardly depart. As Judge Weinstein has noted,

even the most extenuating family circumstances may be outweighed by other considerations. The defendant's crime may be serious enough that, for purposes of incapacitation or specific or

general deterrence, the full Guidelines sentence must be imposed.

*Naugle,* 879 F.Supp. at 265.

The decision is a most difficult one, for balanced against White's "extenuating family circumstances" are the seriousness of the crime and the need for both specific and general deterrence. This was a violent crime that resulted in the death of one of the participants. Bank employees, customers, numerous police officers, and a parking lot attendant all were put at risk of serious harm or even death. Likewise, the Court has to be concerned that a downward departure would send the wrong message that a defendant can commit a crime as serious as bank robbery and yet be permitted to hide behind her children. *See United States v. Stefonek,* 179 F.3d 1030, 1038 (7th Cir.1999) ("Imprisoning the mother of a child for even a short period of time is bound to be a wrenching experience for the child, but the guidelines do not contemplate a discount for parents of children.").

On balance, I conclude that the equities weigh in favor of a departure—to the extent discussed below. The children deserve consideration, and a sentence within the Guidelines range of 57 to 71 months would almost certainly and irreparably destroy the family as a unit. Even with a departure, the needs of justice can be met. *See Johnson,* 964 F.2d at 125 ("The United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom."). Accordingly, the motion for a downward departure is granted.

### 3. *To What Extent Should the Court Depart?*

There remains the issue of the extent to which the Court should depart. White requests the equivalent of a 15–level departure, to a sentence of probation with home confinement.

I will not depart to that extent. Although the family circumstances are extraordinary, a sentence of probation for bank robbery would send the wrong message and leave White utterly unpunished. Courts cannot overlook serious criminal offenses merely because they are committed by single parents, particularly when those parents apparently do not become concerned with the well-being of their children until they are facing imprisonment. Indeed, these parents surely were not thinking of the best interests of their children when they committed their crimes. In this case, White and Hicks are the mothers of nine children between them,[2] and still they participated in the bank robbery. In fact, they did so with Hicks's baby in the backseat of the car.

White argues that her role was minor, she was just a lookout, and she was to be paid only $250. Even so, if White had not been willing to perform the function of a lookout, perhaps her cousin Hicks would have been reluctant to participate as well, and without the two lookouts, perhaps Snype and Partlow would not have gone forward with the crime. In addition, White continued to participate after the robbery, joining the effort to retrieve Partlow's car and helping to hide Snype's car.

White argues that any prison sentence would defeat the purpose of the downward departure, as any significant period of incarceration could lead to the placement of the children in foster care. That may be so. But to be clear, any hardship that befalls her family is a consequence not of her sentence but of her criminal actions and her failure to act in the best interests of her children.

2. Hicks has four children, ranging in age from 2 to 13.

The Court will endeavor to impose a sentence that not only furthers the goals of retribution and deterrence, but that also will give White and her children some hope that they will be able to continue as a family unit upon her release.

The Court will depart eight levels—from Level 25 to Level 17. With the Criminal History category of I, the new range is 24 to 30 months.

### CONCLUSION

The defendant Marlo White will be sentenced to a term of imprisonment within the range of 24 to 30 months. Sentencing will take place on Monday, February 2, 2004, at 4:30 p.m.

SO ORDERED.